**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** ) | | |
| ) | | |
| **Plaintiff,** ) | | |
| ) | | |
| **v.** ) | **CASE NUMBER: 1:21-cr-41** | |
| ) | | |
| **SCOTT E. DAVIDSON** ) | | |
| ) | | |
| **Defendant.** ) | | |

**SENTENCING MEMORANDUM**

Comes now the defendant, Scott E. Davidson, (hereinafter "Scott" or "Davidson"), by counsel, and submits to the Court this sentencing memorandum to assist the Court in exercising its discretion to impose the minimally sufficient sentence that achieves the statutory purpose of sentencing as required by 18 U.S.C. 3553(a).

**18 U.S.C. § 3553(a) factors**

**Nature and Circumstances of the Offense**

Davidson agrees with the summary of the Offense Conduct identified in Paragraphs 12-22 of the Presentence Investigation Report ("PSIR"). Davidson was pulled over twice and found to be in possession of controlled substances. In November 2020 he was stopped by law enforcement after committing several traffic infractions. A canine alert led to the search of the vehicle that Scott was driving. Methamphetamine, a digital scale and used plastic baggies were found inside the car. Davidson was taken to the police station where he waived his *Miranda* rights and admitted that he smoked methamphetamine 20-30 minutes prior to the traffic stop. He said he typically smoked 3-5 grams of meth a day. He then admitted to "reupping" earlier in the day and sold methamphetamine to two women.

1

On January 30, 2021, Scott was again driving a car that was stopped for a traffic infraction. His daughter was in the car with him, and law enforcement was aware that she had a warrant for her arrest. Again, a K9 alert led to a search of the vehicle and methamphetamine, a scale, baggies and a smoking device were found. Davidson again waived his *Miranda* rights and admitted that everything in the car was his.

**History and character of the offender**

Scott is submitting with this memorandum a video with interviews from family and friends. (*See* Ex. A).

Scott has an undeniably poor criminal history. Since 2005, Scott has been an active methamphetamine addict. His first meth-related arrest was April 7, 2005. He was convicted of Dealing Methamphetamine and was ordered to serve 6 years of a 10-year sentence. (PSIR ¶ 56). On June 25, 2007, he was released to the Serenity House and a year later he was successfully released from the Serenity House to probation. He successfully completed probation 2 years later. (PSIR ¶ 56). It appears that he was able to remain sober for about 3 years while at the Serenity House and then while on probation.

Between 2010 and 2015 Scott had misdemeanor driving and drunk driving cases. He violated his probation on a driving while suspended case by testing positive for methamphetamine. (PSIR ¶ 78).

In 2015, Scott was convicted of Possession of Methamphetamine and then Conspiracy to Commit Dealing in Methamphetamine. As a condition of his sentence in both cases, Scott was again ordered to complete the program at the Serenity House. He was at the Serenity House for 2 years during which he actively worked the program and gained tools to live a sober life. (PSIR ¶ 82). He was successfully discharged from probation on September 24, 2019. (PSIR ¶ 19).

Scott was released on Pretrial Services supervision on June 16, 2021. He has resided at the Serenity House in Warsaw, Indiana while on supervision. According to Brian Jackson and Steve Smith, Scott has acquired the position of "Senior House Resident." Steven Smith, Executive Director of the Serenity House, explained that the Senior House Resident is a position that puts more responsibility on the individual. While Scott is not part of management at the house, as Senior House Resident he becomes "the eyes and ears of the manager". (See Ex. A). He also explained that Scott's addiction has been a vicious cycle for him. He said there is something "deep rooted" that causes Scott to relapse and use drugs and maybe Scott has found that reason while residing at the Serenity House. It will take Scott leaving the Serenity House and getting back on the street before he will know if he has the ability to fight his addiction and remain sober.

Linda VanAuken-Fisher, an addiction therapist for 30-plus years, provided hope that Scott has been successful while at the half-way house to acquire the tools that he needs to remain sober when he is released from prison. She said Scott was able to articulate why this arrest is the "it" for him. This arrest has finally made him realize that because of his age, his parents' ages, and his own health, that he may not get another chance to have his family and the support of his family if he continues to use drugs. (See Ex. A).

Scott's siblings, Nicole Saylor and Tim Davidson, sent letters to the Court on their brother's behalf. Nicole described Scott as "a king and a gentle man, who is very attentive to caring for our parents and helps out quite a bit at the Serenity House." [DE 60]. Tim said that Scott is "one of the most caring people I know. His heart is bigger than his mind and he, I believe, would do anything for anyone if he could." [DE 61].

Scott immediately took responsibility for his actions both times that he was stopped by police. On both occasions he voluntarily waived his right to remain silent and admitted to using,

possessing and selling methamphetamine to support his addiction.

Scott's sentencing guideline range is largely driven by the purity of the methamphetamine. However, the guideline's current severe penalties for methamphetamine, especially purity-based, are not justified by any purpose of sentencing or connected and supported by empirical data. In fact, the Commission increased the severity of methamphetamine weight without any data-driven basis or analysis. *Compare* U.S.S.G. § 2D1.1 (1987) with USSG § 2D1.1 (2011).

As to the seriousness of the offense, § 3553(a)(2)(A), that the sentencing guidelines offer no rationale on why methamphetamine is presently punished more severely than any other drug cautions against this Court giving undue consideration of the methamphetamine guideline.  In fact, there is evidence showing that methamphetamine is less physically addictive and dangerous than heroin or cocaine, yet treated more harshly.[1] At bottom, the methamphetamine sentencing guideline provisions and treatment, particularly based on purity, are not consistent with the Sentencing Commissions "characteristic institutional role" of basing its determinations on "empirical data and national experience."  *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).  Indeed, the Sentencing Commission's unwarranted outcomes and disparate treatment of methamphetamine is precisely why the sentencing guidelines cannot provide a presumptively reasonable range in this case.  *See Nelson v. United States*, 555 U.S. 350, 352 (2009) (reasoning that "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.").

Scott suffers from COPD and chronic bronchitis and consequently suffers coughing fits;

---

1 Rates were calculated using the latest (2010) data from the National Survey on Drug Use and Health, the Drug Abuse Warning Network, and the Treatment Episode Dataset – Admissions. These datasets are available at http://www.icpsr.umich.edu/icpsrweb/SAMHDA/sda.  Rates of ER mentions and treatment episodes for cocaine (all forms) may be understated because users of both crack and powder cocaine are not identified in the data for number of users.

difficulty breathing and makes frequent trips to the hospital for breathing treatments. Scott will need medical treatment while incarcerated to manage his chronic illnesses.

In addition, given his health, Scott has been significantly deterred. In terms of general deterrence, research has consistently shown that while the certainty of being apprehended and punished has a general deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1. 28 (2006). "Three National Academy of Science panels . . . [reached] that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, Exploring the Limits of Restorative Justice Paradigm: Restorative Justice and White-Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

### Conclusion

Mr. Davidson knows his life does not look good on paper. His criminal history is extensive, and his history of methamphetamine addiction has been debilitating. Mr. Davidson's story, however, is much more than these summaries of bad decisions.  He does not offer excuses for his misconduct, and instead simply wants this Court to know why and how that history came to be. What Mr. Davidson seeks is one more chance to overcome that causal history and show he can be a productive person and an engaged father. Mr. Smith said that Scott does well when he is under supervision. Scott acknowledges his guilt and has accepted responsibility for his conduct.  Mr. Davidson asks the Court for a sentence that is sufficient but not greater than necessary to punish him and yet protect the public from further crimes.


Respectfully Submitted,

Northern District of Indiana Federal
Federal Community Defenders, Inc.

By:    s/ Michelle F. Kraus
          Michelle F. Kraus
          200 E. Main Street, Suite 905
          Fort Wayne, Indiana 46802
          Phone: (260) 422-9940
          Michelle_Kraus@fd.org

## **CERTIFICATE OF SERVICE**

I hereby certify that, on 1/4/2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notifications of such filing to all parties of record.

s/ Michelle F. Kraus

6